United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Decided September 7, 1999

 Redacted Version Issued September 13, 1999

 In re: Sealed Case No. 99-3091 
 (Office of Independent Counsel Contempt Proceeding)

 Consolidated with 
 99-3092

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 99ms00038)

 ---------

 ON A MOTION FOR SUMMARY REVERSAL OR STAY

 ---------

 Kenneth W. Starr, Independent Counsel, Paul Rosenzweig, 
Associate Independent Counsel, Donald T. Bucklin, and An-
drew W. Cohen, for appellant the United States.

 James K. Robinson, Assistant Attorney General, Michael 
E. Horowitz, Deputy Assistant Attorney General, and Lisa 
Simotas, Attorney, for the Attorney General.

 David E. Kendall, Nicole K. Seligman, Alicia L. Marti, for 
William J. Clinton.

 W. Neil Eggleston, Timothy K. Armstrong, for the Office 
of the President.

 Before: Wald, Silberman, and Henderson, Circuit Judges

 Opinion for the Court filed Per Curiam.

 PER CURIAM: The Office of Independent Counsel (OIC) 
seeks summary reversal of the district court's order to show 
cause why OIC should not be held in contempt for violating 
the grand jury secrecy rule, and its order appointing the 
United States Department of Justice as prosecutor of OIC in 
a criminal contempt proceeding. In the alternative, OIC 
seeks a stay of those orders pending appeal. We conclude we 
have jurisdiction to consider the interlocutory appeal and 
grant the motion for summary reversal.

 I.

 On January 31, 1999, while the Senate was trying President 
William J. Clinton on articles of impeachment, the New York 
Times published a front page article captioned "Starr is 
Weighing Whether to Indict Sitting President." As is rele-
vant here, the article reported:

 Inside the Independent Counsel's Office, a group of 
 prosecutors believes that not long after the Senate trial 
 concludes, Mr. Starr should ask the grand jury of 23 men 
 and women hearing the case against Mr. Clinton to indict 
 him on charges of perjury and obstruction of justice, the 
 associates said. The group wants to charge Mr. Clinton 
 with lying under oath in his Jones deposition in January 
 1998 and in his grand jury testimony in August, the 
 associates added.
 
The next day, the Office of the President (the White House) 
and Mr. Clinton jointly filed in district court a motion for an 
order to show cause why OIC, or the individuals therein, 
should not be held in contempt for disclosing grand jury 
material in violation of Federal Rule of Criminal Procedure 

6(e).1 The White House and Mr. Clinton pointed to several 
excerpts from the article as evidence of OIC's violations of 
the grand jury secrecy rule.

 OIC responded that the matters disclosed in the article 
merely rehashed old news reports and, in any event, did not 
fall within Rule 6(e)'s definition of "matters occurring before 
the grand jury." OIC also submitted a declaration from 
Charles G. Bakaly, III, then-Counselor to the Independent 
Counsel, regarding his communications with the author of the 
article, Don Van Natta, Jr. Bakaly declared, among other 
things, that in his conversations with Van Natta about wheth-
er the Independent Counsel could indict the President while 
still in office, "I refused to confirm or comment on what 
Judge Starr or the OIC was thinking or doing." According to 
OIC, the declaration was for the purpose of demonstrating 
that even if the matters disclosed were grand jury material, 
OIC was not the source of the information in the article.

 Notwithstanding the foregoing, Independent Counsel Ken-
neth W. Starr asked the Federal Bureau of Investigation to 
provide OIC assistance in conducting an internal leak investi-
gation. The Department of Justice authorized the FBI to do 
so, and as a result of the investigation, [

 ]2 Consequently, OIC took ad-
ministrative action against Bakaly and referred the matter to 
the Department of Justice for a criminal investigation and 
decision. OIC informed the district court of these develop-
ments, withdrew Bakaly's declaration, and abandoned its 
argument that OIC was not the source of the information 
disclosed in the New York Times article. Although OIC 
noted that "the article regrettably discloses sensitive and 
confidential internal OIC information," it continued to main-
tain that the information was not protected by Rule 6(e).

__________
 1 That rule provides in relevant part: "[A]n attorney for the 
government ... shall not disclose matters occurring before the 
grand jury, except as otherwise provided in these rules...."

 2 Bold brackets signify sealed material.

 Troubled by these developments, the district court ordered 
Bakaly and OIC to show cause why they should not be held in 
civil contempt for a violation of Rule 6(e), concluding that the 
portion of the New York Times article quoted above revealed 
grand jury material and constituted a prima facie violation of 
Rule 6(e). [

 

 ] The district court scheduled a consolidated 
show cause hearing, ordered the FBI and OIC to produce in 
camera all their relevant investigative reports, and required 
the FBI agents involved in the investigation to appear to 
testify. In accordance with this court's holding in In re 
Sealed Case No. 98-3077, 151 F.3d 1059, 1075-76 (D.C. Cir. 
1998), the district court ordered that the proceedings be 
closed and ex parte.

 Convinced that the district court had misinterpreted this 
court's precedent, OIC and Bakaly asked the district court to 
certify for interlocutory appeal the question of the proper 
scope of Rule 6(e). The district court denied the request, 
referring only to its previous orders. In the meantime, DOJ 
entered an appearance as counsel for the potential FBI 
witnesses and sought a stay of the proceedings, including 
Bakaly's requests for discovery, pending the completion of its 
criminal investigation. The district court granted the stay, 
and on July 13, DOJ notified the district court by letter that 
it had completed its investigation. [

 

 

 

 

 ]

 One day later, on July 14th, the district court sua sponte 
issued an order appointing DOJ to serve as prosecutor of the 
contempt charges against Bakaly and OIC. The district 
court explained its unexpected inclusion of OIC in DOJ's 
prosecution: "DOJ's letter only refers to the contempt 

charges lodged against Mr. Bakaly. However, the Court also 
needs to resolve the closely related allegations against the 
OIC. The Court believes that these matters are best re-
solved through a single contempt proceeding involving both 
Mr. Bakaly and the OIC." Although the district court decid-
ed to afford Bakaly and OIC the protections of criminal law, 
it left open the possibility of civil, or a combination of civil and 
criminal, contempt sanctions. The district court also sched-
uled a pre-trial status conference for July 23.

 Both DOJ and OIC responded immediately. In another 
letter to the court, DOJ asked the district court to withdraw 
its referral of OIC for prosecution. DOJ explained that 
based on its investigation, there was no factual basis for 
proceeding with a criminal contempt prosecution against the 
OIC in connection with the New York Times article. In 
addition, DOJ stated its view that the district court lacked 
authority to proceed against OIC for criminal contempt be-
cause Rule 6(e) only applies to individuals, OIC cannot be 
held vicariously liable for acts of its staff, and OIC is entitled 
to sovereign immunity.

 OIC filed an emergency motion to vacate the district 
court's July 14 order, objecting to being named as a criminal 
defendant and to the entry of an order without affording the 
parties an opportunity to respond to DOJ's first letter. OIC 
also argued that there was no factual basis for the order, and 
raised numerous legal objections, including the argument that 
OIC is entitled to sovereign immunity from a criminal con-
tempt proceeding.

 Faced with having to enter an appearance as a criminal 
defendant at the status conference scheduled for July 23, and 
not having obtained a ruling from the district court on the 
emergency motion, on July 22, OIC noted an ex parte appeal 
from the district court's March 25 and July 14 orders and 
filed a motion for summary reversal or, in the alternative, 
stay pending appeal.3 Because the criminal contempt pro-
ceedings were scheduled to commence immediately, we issued 

__________
 3 OIC also filed a petition for writ of mandamus in the event 
this court does not have jurisdiction over the interlocutory appeal.

an administrative stay of those proceedings so that we would 
have sufficient opportunity to consider the merits of the 
motion. To obtain an adversarial viewpoint on what we 
consider to be the dispositive issue in this case, we ordered 
Mr. Clinton and the White House, along with DOJ and OIC, 
to brief the question whether the alleged disclosures in the 
New York Times article relied upon by the district court in 
ordering a criminal contempt proceeding constitute a prima 
facie violation of Rule 6(e).

 II.

 Before reaching that issue, we explain the basis of our 
jurisdiction over this interlocutory appeal. OIC claims that 
as a federal agency it is immune from criminal contempt 
charges. It is well established that "[t]he United States, as 
sovereign, is immune from suit save as it consents to be sued 
..., and the terms of its consent to be sued in any court 
define that court's jurisdiction to entertain the suit." United 
States v. Sherwood, 312 U.S. 584, 586 (1941) (citations omit-
ted). Based on its claim of sovereign immunity, OIC con-
tends that the district court's ruling is immediately appeal-
able as a collateral order. We agree.

 In order to qualify as a collateral order, the challenged 
order must "conclusively determine the disputed question, 
resolve an important issue completely separate from the 
merits of the action, and be effectively unreviewable on 
appeal from a final judgment." Coopers & Lybrand v. Live-
say, 437 U.S. 463, 468 (1978). Here, the district court failed 
to respond to OIC's motion to vacate and allowed to stand its 
order requiring OIC to appear as a criminal defendant at a 
status conference. Given these circumstances, we understand 
the district court to have conclusively rejected OIC's claim of 
immunity. That determination resolves an important issue 
separate from the merits of the contempt charge.

 As to the remaining factor, federal sovereign immunity is 
an immunity from suit, not simply a defense to liability on the 
merits. See FDIC v. Meyer, 510 U.S. 471, 475 (1994). Con-
sequently, the right to be free from the burdens of trial is 
effectively unreviewable on appeal from a final judgment. 

See, e.g., Midland Asphalt Corp. v. United States, 489 U.S. 
794, 800-01 (1989) ("[D]eprivation of the right not to be tried 
satisfies the ... requirement of being 'effectively unreview-
able on appeal from a final judgment.' "). Although the 
Seventh Circuit has concluded in a civil case that the federal 
government, as opposed to a state or foreign sovereign, does 
not have a right to an interlocutory appeal based on a claim of 
sovereign immunity, see Pullman Constr. Indus., Inc. v. 
United States, 23 F.3d 1166, 1169 (7th Cir. 1994); see also 
Alaska v. United States, 64 F.3d 1352, 1355-57 (9th Cir. 1995) 
(following Pullman), the Seventh Circuit based its decision in 
large part on the premise that the Administrative Procedure 
Act (APA), 5 U.S.C. s 702, waives federal sovereign immunity 
for equitable relief.4 As discussed below, it is far from clear 
that Congress has waived federal sovereign immunity in the 
context of criminal contempt. We think that OIC's substan-
tial claim of immunity from the proceedings ordered by the 
district court suffices to entitle OIC to an interlocutory 
appeal.

 III.

 In deciding that the federal government was not entitled to 
an interlocutory appeal based on sovereign immunity, the 
Seventh Circuit broadly stated: "Now that 5 U.S.C. s 702 
exposes the United States to equitable relief,5 it is difficult to 

__________
 4 That section of the APA provides in relevant part:

 A person suffering legal wrong because of agency action, or 
 adversely affected or aggrieved by agency action within the 
 meaning of a relevant statute, is entitled to judicial review 
 thereof. An action in a court of the United States seeking 
 relief other than money damages and stating a claim that an 
 agency or an officer or employee thereof acted ... in an official 
 capacity or under color of legal authority shall not be dismissed 
 nor relief therein be denied on the ground that it is against the 
 United States or that the United States is an indispensable 
 party.
 
 5 But cf. Department of the Army v. Blue Fox, Inc., 119 S.Ct. 
687, 691 (1999) (Section 702 makes distinction between specific relief 

speak of federal sovereign immunity as a 'right not to be 
sued.' " Pullman, 23 F.3d at 1168. It concluded that "[f]ed-
eral sovereign immunity today is nothing but a condensed 
way to refer to the fact that monetary relief is permissible 
only to the extent Congress has authorized it.... " Id. The 
Ninth Circuit agreed that "federal sovereign immunity [is] 
more accurately considered a right to prevail at trial, i.e., a 
defense to payment of damages." Alaska, 64 F.3d at 1355 
(emphasis in original).6

 We rather doubt that federal sovereign immunity is so 
limited, especially in the unique circumstances presented 
here. "A waiver of the Federal Government's sovereign im-
munity must be unequivocally expressed in [the] statutory 
text." Lane v. Pena, 518 U.S. 187, 192 (1996). We know of 
no statutory provision expressly waiving federal sovereign 
immunity from criminal contempt proceedings.

 We need not decide this issue of first impression, howev-
er, because there is another ground upon which we can 
dispose of this case that does not raise constitutional con-
cerns.7 As we recently concluded, although a federal court 

__________
and substitute relief, not equitable and nonequitable categories of 
remedies).

 6 There are cases suggesting otherwise. In the civil context, 
the Fifth Circuit has held that the United States is immune from 
suit under Rule 6(e), see McQueen v. Bullock, 907 F.2d 1544 (5th 
Cir.1990), and the Eighth Circuit has held that the United States 
has not waived sovereign immunity for civil contempt under 18 
U.S.C. s 401, which gives the court power to punish contempt by 
fine or imprisonment, see Coleman v. Espy, 986 F.2d 1184 (8th 
Cir.1993). Neither of these cases, however, takes into account the 
waiver of immunity in 5 U.S.C. s 702. Cf. Armstrong v. Executive 
Office of the President, 821 F.Supp. 761 (D.D.C) (discussing waiver 
in 5 U.S.C. s 702, holding United States in civil contempt of court, 
and imposing coercive fines), rev'd on other grounds, 1 F.3d 1274 
(D.C. Cir. 1993).

 7 We assume federal sovereign immunity "is derived from 
article III, section 2, of the Constitution," Bartlett ex rel. Neuman 
v. Bowen, 824 F.2d 1240, 1248 (D.C. Cir.1987) (joint statement 

generally must determine whether it has jurisdiction over a 
case before reaching its merits, see Steel Co. v. Citizens for 
a Better Env't, 118 S.Ct. 1003, 1012 (1998), "a less than pure 
jurisdictional question, need not be decided before a merits 
question." United States ex rel. Long v. SCS Business & 
Technical Inst., Inc., 173 F.3d 890, 894 (D.C. Cir. 1999) 
(supplemental opinion) (Eleventh Amendment immunity is-
sue need not be decided before merits); accord Parella v. 
Retirement Bd. of the Rhode Island Employees' Retirement 
Sys., 173 F.3d 46 (1st Cir. 1999); but see United States ex 
rel. Foulds v. Texas Tech Univ., 171 F.3d 279 (5th Cir. 
1999); Seaborn v. Florida Dep't of Corrections, 143 F.3d 
1405 (1st Cir. 1998), cert. denied, 119 S.Ct. 1038 (1999). 
Federal sovereign immunity, like the state sovereign immu-
nity at issue in Long, differs from the classic "jurisdictional" 
limitations of Article III in that immunity can be waived. 
See FDIC v. Meyer, 510 U.S. at 475 ("Absent a waiver, 
sovereign immunity shields the Federal Government and its 
agencies from suit.") (emphasis added); Idaho v. Coeur d'Al-
ene Tribe of Idaho, 521 U.S. 261, 267 (1997) ("The [Elev-
enth] Amendment ... enacts a sovereign immunity from 
suit, rather than a nonwaivable limit on the Federal Judicia-
ry's subject-matter jurisdiction."). Given the "quasi-
jurisdictional or 'hybrid' status," Long, 173 F.3d at 893, of 
federal sovereign immunity, we are not required to decide 
that issue before the merits. Moreover, taking pendent 
jurisdiction and disposing of this case on the merits has the 
added virtues of avoiding a constitutional issue of first im-
pression, see Rendall-Speranza v. Nassim, 107 F.3d 913 
(D.C. Cir. 1997) (allowing interlocutory appeal based on for-
eign sovereign immunity claim, but declining to decide im-
munity issue, which was both difficult and implicated foreign 
relations), while providing much needed clarification on an 
important issue--that is, the proper scope of Rule 6(e)--that 

__________
dissenting from the vacatur of orders and from the denials of 
rehearing en banc), although there is some debate over whether it 
is a constitutional doctrine and, if so, its source in the Constitution, 
see Scott C. Idleman, The Demise of Hypothetical Jurisdiction in 
the Federal Courts, 52 Vand. L. Rev. 235, 349 n.354 (1999).

has arisen in this court on several occasions, and is likely to 
recur.

 IV.

 Turning, then, to the merits of this case, we conclude that 
the disclosures made in the New York Times article do not 
constitute a prima facie violation of Rule 6(e). A prima facie 
violation based on a news report is established by showing 
that the report discloses "matters occurring before the grand 
jury" and indicates that sources of the information include 
government attorneys. See Barry v. United States, 865 F.2d 
1317, 1321 (D.C. Cir. 1989). Because OIC has withdrawn its 
argument that none of its attorneys was the source of the 
disclosures in the New York Times article at issue here, the 
only remaining issue is whether those disclosures qualify as 
"matters occurring before the grand jury." Fed. R. Crim. P. 
6(e)(2).8

 The district court concluded that only one excerpt from the 
New York Times article constituted a prima facie violation of 
Rule 6(e). That excerpt, quoted in full supra at __, disclosed 
the desire of some OIC prosecutors to seek, not long after the 
conclusion of the Senate trial, an indictment of Mr. Clinton on 
perjury and obstruction of justice charges, including lying 
under oath in his deposition in the Paula Jones matter and in 
his grand jury testimony. These statements, according to the 
district court, reveal a specific time frame for seeking an 
indictment, the details of a likely indictment, and the direction 
a group of prosecutors within OIC believes the grand jury 
investigation should take. Not surprisingly, Mr. Clinton and 
the White House agree with the district court's expansive 
reading of Rule 6(e). OIC takes a narrow view of the Rule's 
coverage, arguing that matters occurring outside the physical 
presence of the grand jury are covered only if they reveal 
grand jury matters. DOJ generally supports OIC with re-

__________
 8 OIC contends that as an entity rather than an individual, it is 
not subject to Rule 6(e). It is unnecessary to decide this issue 
given our conclusion that there is no prima facie violation of Rule 
6(e).

spect to the Rule's coverage, but emphasizes the importance 
of the context and concreteness of disclosures.

 The key to the district court's reasoning is its reliance on 
this court's definition of "matters occurring before the grand 
jury." In In re Motions of Dow Jones & Co., 142 F.3d 496, 
500 (D.C. Cir. ), cert. denied, 119 S.Ct. 60 (1998), we noted 
that this phrase encompasses "not only what has occurred 
and what is occurring, but also what is likely to occur," 
including "the identities of witnesses or jurors, the substance 
of testimony as well as actual transcripts, the strategy or 
direction of the investigation, the deliberations or questions of 
jurors, and the like." Id. (internal quotation omitted). In the 
earlier contempt proceeding against Independent Counsel 
Starr, however, we cautioned the district court about "the 
problematic nature of applying so broad a definition, especial-
ly as it relates to the 'strategy or direction of the investiga-
tion,' to the inquiry as to whether a government attorney has 
made unauthorized disclosures." In re Sealed Case No. 98-
3077, 151 F.3d at 1071 n.12. Despite the seemingly broad 
nature of the statements in Dow Jones, we have never read 
Rule 6(e) to require that a "veil of secrecy be drawn over all 
matters occurring in the world that happen to be investigated 
by a grand jury." Securities & Exch. Comm'n v. Dresser 
Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc). 
Indeed, we have said that "[t]he disclosure of information 
'coincidentally before the grand jury [which can] be revealed 
in such a manner that its revelation would not elucidate the 
inner workings of the grand jury' is not prohibited." Senate 
of Puerto Rico v. United States Dep't of Justice, 823 F.2d 574, 
582 (D.C. Cir. 1987)(quoting Fund for Constitutional Gov't v. 
National Archives and Records Serv., 656 F.2d 856, 870 (D.C. 
Cir. 1981)). Thus, the phrases "likely to occur" and "strategy 
and direction" must be read in light of the text of Rule 6(e)--
which limits the Rule's coverage to "matters occurring before 
the grand jury"--as well as the purposes of the Rule.

 As we have recited on many occasions,

 Rule 6(e) ... protects several interests of the criminal 
 justice system: "First, if preindictment proceedings were 
 
 made public, many prospective witnesses would be hesi-
 tant to come forward voluntarily, knowing that those 
 against whom they testify would be aware of that testi-
 mony. Moreover, witnesses who appeared before the 
 grand jury would be less likely to testify fully and 
 frankly, as they would be open to retribution as well as 
 to inducements. There also would be the risk that those 
 about to be indicted would flee, or would try to influence 
 individual grand jurors to vote against indictment. Fi-
 nally, by preserving the secrecy of the proceedings, we 
 assure that persons who are accused but exonerated by 
 the grand jury will not be held up to public ridicule."
 
In re Sealed Case No. 98-3077, 151 F.3d 1059, 1070 (D.C. 
Cir.1998)(quoting Douglas Oil Co. v. Petrol Stops Northwest, 
441 U.S. 211, 219 (1979)); see also Fund for Constitutional 
Gov't, 656 F.2d at 869 (same). These purposes, as well as the 
text of the Rule itself, reflect the need to preserve the secrecy 
of the grand jury proceedings themselves. It is therefore 
necessary to differentiate between statements by a prosecu-
tor's office with respect to its own investigation, and state-
ments by a prosecutor's office with respect to a grand jury's 
investigation, a distinction of the utmost significance upon 
which several circuits have already remarked. See, e.g., 
United States v. Rioux, 97 F.3d 648, 662 (2d Cir.1996)("Most 
of the media surrounding the Rioux investigation ... dis-
cussed federal 'investigations,' without actually discussing 
matters before the grand jury."); In re Grand Jury Subpoe-
na, 920 F.2d 235, 242 (4th Cir.1990) ("[I]nformation produced 
by criminal investigations paralleling grand jury investiga-
tions does not constitute matters 'occurring before the grand 
jury' if the parallel investigation was truly independent of the 
grand jury proceedings."); Blalock v. United States, 844 F.2d 
1546, 1551 (11th Cir.1988) ("[T]he agents could not have 
violated Rule 6(e)(2) merely by allowing the Georgia Power 
investigators to be present during the questioning of poten-
tial grand jury witnesses.... To have violated Rule 6(e)(2) 
... the agents must have disclosed to the Georgia Power 
investigators information revealing what had transpired, or 
will transpire, before the grand jury.") (emphasis added); In 

re Grand Jury Investigation ["Lance"], 610 F.2d 202, 217 
(5th Cir.1980) ("[T]he disclosure of information obtained from 
a source independent of the grand jury proceedings, such as a 
prior government investigation, does not violate Rule 6(e).").

 Information actually presented to the grand jury is core 
Rule 6(e) material that is afforded the broadest protection 
from disclosure. Prosecutors' statements about their investi-
gations, however, implicate the Rule only when they directly 
reveal grand jury matters. To be sure, we have recognized 
that Rule 6(e) would be easily evaded if a prosecutor could 
with impunity discuss with the press testimony about to be 
presented to a grand jury, so long as it had not yet occurred. 
Accordingly, we have read Rule 6(e) to cover matters "likely 
to occur." And even a discussion of "strategy and direction 
of the investigation" could include references to not yet 
delivered but clearly anticipated testimony. See Lance, 610 
F.2d at 216-17 and n.4. But that does not mean that any 
discussion of an investigation is violative of Rule 6(e). In-
deed, the district court's Local Rule 308(b)(2), which governs 
attorney conduct in grand jury matters, recognizes that pros-
ecutors often have a legitimate interest in revealing aspects of 
their investigations "to inform the public that the investiga-
tion is underway, to describe the general scope of the investi-
gation, to obtain assistance in the apprehension of a suspect, 
to warn the public of any dangers, or otherwise aid in the 
investigation."

 It may often be the case, however, that disclosures by the 
prosecution referencing its own investigation should not be 
made for tactical reasons, or are in fact prohibited by other 
Rules or ethical guidelines. For instance, prosecutors may be 
prohibited by internal guidelines, see, e.g., United States 
Attorney Manual s 1-7.530, from discussing the strategy or 
direction of their investigation before an indictment is 
sought.9 This would serve one of the same purposes as Rule 

__________
 9 But see Eric H. Holder and Kevin A. Ohlson, Dealing with 
the Media in High-Profile White Collar Cases: The Prosecutor's 
Dilemma, in White Collar Crime, at B-1, B-1 to B-2 (1995) ("[I]n 
cases involving well-known people, the public has a right to be kept 

6(e): protecting the reputation of innocent suspects. But a 
court may not use Rule 6(e) to generally regulate prosecutori-
al statements to the press. The purpose of the Rule is only 
to protect the secrecy of grand jury proceedings.

 Thus, internal deliberations of prosecutors that do not 
directly reveal grand jury proceedings are not Rule 6(e) 
material. As the Fifth Circuit stated in circumstances similar 
to those presented here,

 [a] discussion of actions taken by government attor-
 neys or officials--e.g., a recommendation by the Justice 
 Department attorneys to department officials that an 
 indictment be sought against an individual--does not 
 reveal any information about matters occurring before 
 the grand jury. Nor does a statement of opinion as to an 
 individual's potential criminal liability violate the dictates 
 of Rule 6(e). This is so even though the opinion might be 
 based on knowledge of the grand jury proceedings, pro-
 vided, of course, the statement does not reveal the grand 
 jury information on which it is based.
 
Lance, 610 F.2d at 217; accord United States v. Smith, 787 
F.2d 111, 115 (3d Cir. 1986)("We agree with the Fifth Circuit 
that a statement of opinion by a Justice Department attorney 
as to an individual's potential criminal liability does not 
violate the dictates of Rule 6(e)...."). It may be thought 
that when such deliberations include a discussion of whether 
an indictment should be sought, or whether a particular 
individual is potentially criminally liable, the deliberations 
have crossed into the realm of Rule 6(e) material. This 
ignores, however, the requirement that the matter occur 

__________
reasonably informed about what steps are being taken to pursue 
allegations of wrongdoing so that they can determine whether 
prosecutors are applying the law equally to all citizens. This point 
has become particularly pertinent in recent years because powerful 
figures increasingly seem to characterize criminal investigations of 
their alleged illegal conduct as 'political witch hunts.' This type of 
epithet only serves to unfairly impugn the motives of prosecutors 
and to undermine our legal system, and should not go unan-
swered.").

before the grand jury. Where the reported deliberations do 
not reveal that an indictment has been sought or will be 
sought, ordinarily they will not reveal anything definite 
enough to come within the scope of Rule 6(e).

 For these reasons, the disclosure that a group of OIC 
prosecutors "believe" that an indictment should be brought at 
the end of the impeachment proceedings does not on its face, 
or in the context of the article as a whole, violate Rule 6(e).10 
We acknowledge, as did OIC, that such statements are trou-
bling, for they have the potential to damage the reputation of 
innocent suspects. But bare statements that some assistant 
prosecutors in OIC wish to seek an indictment do not impli-
cate the grand jury; the prosecutors may not even be basing 
their opinion on information presented to a grand jury.

 The fact that the disclosure also reveals a time period for 
seeking the indictment of "not long after the Senate trial 
concludes" does not in any way indicate what is "likely to 
occur" before the grand jury within the meaning of Rule 6(e). 
That disclosure reflects nothing more than a desire on the 
part of some OIC prosecutors to seek an indictment at that 
time, not a decision to do so. The general uncertainty as to 
whether an indictment would in fact be sought (according to 
the article, only some prosecutors in OIC thought one should 
be) leads us to conclude that this portion of the article did not 
reveal anything that was "occurring before the grand jury."

 Nor does it violate the Rule to state the general grounds 
for such an indictment--here, lying under oath in a deposition 
and before the grand jury--where no secret grand jury 
material is revealed. In ordinary circumstances, Rule 6(e) 
covers the disclosure of the names of grand jury witnesses. 
Therefore, the statement that members of OIC wished to 
seek an indictment based on Mr. Clinton's alleged perjury 
before a grand jury would ordinarily be Rule 6(e) material. 
In this case, however, we take judicial notice that the Presi-
dent's status as a witness before the grand jury was a matter 

__________
 10 Indeed, the article stated that Independent Counsel Starr 
had not himself made any decision on whether to bring an indict-
ment.

of widespread public knowledge well before the New York 
Times article at issue in this case was written; the President 
himself went on national television the day of his testimony to 
reveal this fact. Cf. Dow Jones, 142 F.3d at 505 ("Carter's 
identity as a person subpoenaed to appear before the grand 
jury has [lost its character as 6(e) material] ... because 
Carter's attorney decided to reveal this fact to the public."). 
Where the general public is already aware of the information 
contained in the prosecutor's statement, there is no additional 
harm in the prosecutor referring to such information.11 See 
In Re North, 16 F.3d 1234, 1245 (D.C. Cir. 1994) ("There 
must come a time ... when information is sufficiently widely 
known that it has lost its character as Rule 6(e) material. 
The purpose in Rule 6(e) is to preserve secrecy. Information 
widely known is not secret."); see also In re Petition of Craig 
v. United States, 131 F.3d 99, 107 (2d Cir. 1997) ("[T]he 
extent to which the grand jury material in a particular case 
has been made public is clearly relevant because even partial 
previous disclosure often undercuts many of the reasons for 
secrecy.").12 Therefore, it cannot be said that OIC "disclosed" 
the name of a grand jury witness, in violation of Rule 6(e), by 
referring to the President's grand jury testimony.13

__________
 11 The prosecutor must still be careful, of course, when making 
such statements not to reveal some aspect of the grand jury 
investigation which is itself still cloaked in secrecy.

 12 We agree with DOJ that consideration of whether material 
presumptively within the scope of Rule 6(e) has lost its secrecy 
should be considered at the prima facie stage. Here, the question 
is easily answered by reference to matters of which the court may 
take judicial notice, therefore there is no need for OIC to be put to 
the burden and distraction of an evidentiary hearing to rebut the 
allegations of a Rule 6(e) violation. See In re Sealed Case No. 98-
3077, 151 F.3d at 1075 (once prima facie case established, govern-
ment required to "come forward with evidence, in whatever form 
the district court requires (including affidavits, depositions, produc-
tion of documents, or live testimony)").

 13 Of course, a prosecutor is not free to leak grand jury 
material and then make a self serving claim that the matter is no 
longer secret. Cf. In re North, 16 F.3d 1234, 1245 (D.C. Cir. 1994) 

 Similarly, it would ordinarily be a violation of Rule 6(e) to 
disclose that a grand jury is investigating a particular person. 
Thus, the statement that a grand jury is "hearing the case 
against Mr. Clinton" would be covered by Rule 6(e) if it were 
not for the fact that the New York Times article did not 
reveal any secret, for it was already common knowledge well 
before January 31, 1999, that a grand jury was investigating 
alleged perjury and obstruction of justice by the President. 
Once again, the President's appearance on national television 
confirmed as much.

 V.

 In light of our conclusion that the excerpt from the New 
York Times article does not constitute a prima facie violation 
of Rule 6(e), we reverse and remand with instructions to 
dismiss the Rule 6(e) contempt proceedings against OIC. 
Because we have granted OIC's request for summary rever-
sal, we dismiss as moot the alternative request for a stay, as 
well as the consolidated petition for mandamus. The admin-
istrative stay is lifted.

__________
("We do not intend to formulate a rule that once a leak of Rule 6(e) 
material has occurred, government attorneys are free to ignore the 
pre-existing bond of secrecy.").